CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

MAR 15 2007

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | |
|---|---|
| **EDGAR A. HILL,** ) | Civil Action No. 2:06cv00032 |
| Plaintiff, ) | |
| ) | **MEMORANDUM OPINION** |
| v. ) | |
| ) | |
| **MICHAEL J. ASTRUE,** ) | By: GLEN M. WILLIAMS |
| **Commissioner of Social Security,**[1] ) | SENIOR UNITED STATES DISTRICT JUDGE |
| ) | |
| Defendant. ) | |

In this social security case, the court affirms the final decision of the Commissioner denying benefits.

## I. Background and Standard of Review

Plaintiff, Edgar Allen Hill, filed this action challenging the decision of the Commissioner of Social Security, ("Commissioner"), denying the plaintiff's claim for a period of disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2006). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through

---

[1] Michael J. Astrue became the Commissioner of Social Security on February 12, 2007, and is, therefore, substituted for Jo Anne B. Barnhart as the defendant in this suit pursuant to Federal Rule of Civil Procedure 25(d)(1).

-1-

the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

Hill first filed for DIB on August 14, 1998, alleging disability commencing on September 12, 1997. (Record, ("R."), at 46, 86.) This claim was denied initially and on reconsideration and was not further pursued. (R. at 46, 86.) As a result, the Commissioner's determination dated November 23, 1998, became final. (R. at 86.) Hill again filed a DIB application on February 5, 1999, alleging disability again beginning on September 12, 1997. (R. at 46, 86.) This claim was also denied initially and on reconsideration. (R. at 46, 86.) A hearing on this claim was held before an administrative law judge, ("ALJ"), and this claim was denied by opinion dated June 14, 2000. (R. at 46, 86-95.) In denying this claim, the ALJ found that Hill was not disabled, and the ALJ documented exaggerated responses and malingering by Hill. (R. at 46, 51, 91, 94.) Upon denial by the ALJ, Hill requested review of the ALJ's decision. (R. at 46.) On July 31, 2002, the Appeals Counsel denied this request, and civil action was filed in the United States District Court for the Western District of Virginia. (R. at 46, 68.) By Opinion entered July 21, 2003, the ALJ's decision was upheld. (R. at 46-47, 66-82.) No further action was taken; therefore, the ALJ's decision dated June 14, 2000, became the final determination of the Commissioner. (R. at 47.)

Case 2:06-cv-00032-GMW-PMS   Document 13   Filed 03/15/07   Page 2 of 29   Pageid#: 67

The record shows that Hill protectively filed his current application for DIB on September 12, 2002, once again alleging disability as of September 12, 1997, due to a left shoulder injury, muscle cramps and pain, chest and shoulder pain, fibromyalgia, headaches, blurred vision, inability to concentrate or remember, depression and nervousness. (R. at 46, 48, 123, 127.) The claim was denied initially and upon reconsideration. (R. at 46, 104-06, 110-12.) Hill then requested a hearing before an ALJ. (R. at 46, 113-14.) The ALJ held a hearing on May 11, 2004; a second, supplemental hearing was held on September 8, 2004. (R. at 46, 528-41, 542-48.) Hill was represented by counsel at both hearings. (R. at 46, 528, 542.)

By decision dated September 20, 2004, the ALJ denied Hill's claim. (R. at 46-57.) The ALJ found that Hill met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2002, but not thereafter. (R. at 55.) Pursuant to 20 C.F.R. § 404.957(c), the ALJ noted that *res judicata* applied due to the Commissioner's prior final decisions regarding Hill's claims arising from the same facts. (R. at 47.) As a result, the ALJ stated that Hill's prior applications would not be reopened, and all parts of Hill's current claim relating to the time period prior to the final determination made on June 14, 2000, were dismissed pursuant to the doctrine of *res judicata*. (R. at 47.) Thus, the ALJ found the time period at issue in this case to be June 15, 2000, through December 31, 2002. (R. at 47, 49, 55-56.) Upon consideration of the evidence regarding this time period, the ALJ found that Hill was not under either a physical or mental disability. (R. at 48, 56.) The ALJ made a finding that Hill's fibromyalgia and chronic pain syndrome were "severe" impairments based on the requirements of 20 C.F.R. § 404.1520(c). (R. at 55.) However, the ALJ determined that these severe impairments did not meet or medically equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P,

Appendix 1. (R. at 55.) Furthermore, the ALJ found that Hill's allegations regarding his limitations were not totally credible. (R. at 56.) The ALJ concluded that during the period from June 15, 2000, through December 31, 2002,[2] Hill retained the residual functional capacity to perform light work[3] that did not involve excessive bending, stooping, crawling or repetitive overhead lifting with his left arm and shoulder. (R. at 52, 56.) Thus, the ALJ determined that Hill was unable to perform any of his past relevant work as a mechanic, electrician or coal mine shuttle car operator. (R. at 48, 56.) Despite this finding, the ALJ concluded that, based on Hill's age, education and the testimony of a vocational expert, Hill could perform jobs existing in significant numbers in the national economy, including those of a cashier, a sales clerk, an information clerk, an order clerk, a hand packer, a sorter, an assembler, an inspector, a ticket seller and a greeter. (R. at 56.) Therefore, the ALJ found that Hill was not under a "disability," as defined in the Act, at any time prior to December 31, 2002, and that he was not eligible for benefits. (R. at 56.) *See* 20 C.F.R. § 404.1520(g) (2006).

After the ALJ issued his decision, Hill pursued his administrative appeals. (R. at 42.) The Appeals Council denied his request for review on April 28, 2006. (R. at 8.) Hill then filed this action seeking review of the ALJ's unfavorable decision, which now stands at the Commissioner's final decision. *See* 20 C.F.R. § 404.981

---

[2] The ALJ's "Findings" section of his opinion contains a typographical error regarding the period for which he assessed Hill's residual functional capacity. However, it is clear from the text of the opinion and the dates listed throughout the "Findings" section and the rest of the opinion that the ALJ's did properly assess the claimant's residual functional capacity from June 15, 2000, through December 31, 2002.

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can do light work, he also can do sedentary work. *See* 20 C.F.R. § 404.1567(b) (2006).

-4-

(2006). The case is before this court on Hill's motion for summary judgment filed September 19, 2006, (Docket Item No. 9), and on the Commissioner's motion for summary judgment filed October 18, 2006, (Docket Item No. 11).

## II. Facts

Hill was born in 1953. (R. at 48, 120.) Thus, pursuant to 20 C.F.R. § 404.1563(c), Hill was classified as a "person closely approaching advanced age" at the time of the ALJ's opinion; but, Hill was classified as "younger individual" at the time of his alleged onset date. (R. at 48, 54.) Hill received a high-school education. (R. at 54, 133.) However, he has no transferable skills from his previous skilled work as a mechanic, electrician and coal mine shuttle car operator. (R. at 48, 54, 128.)

At his hearing on May 11, 2004, Hill was asked by the ALJ about his ability to work during the time period of June 15, 2000, through December 31, 2002. (R. at 534.) Hill replied that he suffered from constant muscle pain throughout his body. (R. at 534.) Hill went on to explain that his pain impacted his arms, legs, shoulders and back. (R. at 534.) Hill stated that this pain could be triggered by anything, including Hill becoming aggravated or even a loud noise. (R. at 534.)

Hill stated that he could lift his arms over his head, but that he could not lift heavy items off of a shelf. (R. at 534-35.) Hill explained that he could lift a full gallon sized milk jug with one hand and that he could lift a 20-pound bag of potatoes, however, he indicated that if he were to lift such items he would experience quite a bit of lingering pain. (R. at 535.)

Case 2:06-cv-00032-GMW-PMS   Document 13   Filed 03/15/07   Page 5 of 29   Pageid#: 70

Hill stated that he was right handed and had no problems using his fingers and right hand to lift small objects. (R. at 535-36.) However, Hill also stated that he frequently dropped items he was holding. (R. at 536.) He described being able to stand for approximately 30 minutes, after which time his legs would cramp. (R. at 536.) After his legs began to cramp, Hill stated that he would need to lie down with his feet elevated. (R. at 536.) Hill stated that he spent approximately three or four hours per day lying down in a recliner watching television. (R. at 536.) He also stated that he took a daily nap for approximately an hour. (R. at 536.)

In describing the degree of his pain during the applicable time period, Hill stated that the severity of his pain had remained constant since his injury in 1997. (R. at 536.) To relieve his pain, Hill stated that he would take muscle relaxers and pain medication, as well as simply lying down and relaxing until the pain subsided. (R. at 536.) Hill stated that his pain was severe enough, at times, to impact his emotions. (R. at 537.) He described going to bed crying and waking up crying approximately three nights a week due to the pain. (R. at 537.) He also indicated that any sort of harsh words spoken to him could cause him to experience physical pain, which, at times, even impacted his vision. (R. at 537.) As a result, Hill stated that this pain limited his ability to drive and to go shopping. (R. at 537.)

Hill testified that he experienced problems with his memory, and he regularly misplaced objects around the house. (R. at 537-38.) He stated that he had difficulty in school and had to repeat the eighth and eleventh grades. (R. at 538.) Hill also indicated that he did not experience any side effects from his medication. (R. at 538.) Hill also stated that he could still drive, visit his children, occasionally shop at Wal-Mart and read "pretty good." (R. at 537-38.)

-6-

Donna Bardsley, a vocational expert, also was present and testified at Hill's first hearing on May 11, 2004. (R. at 528, 530-34.) The ALJ asked Bardsley several hypothetical questions about the Hill's employment prospects. (R. at 531-33.) In the first of these questions, the ALJ stipulated that the claimant was restricted to light work that did not involve excessive bending, stooping, crawling and repetitive overhead lifting with his left arm and shoulder. (R. at 531-32.) Bardsley then was asked if the claimant would have a greater amount of work available to him in the labor market based on this residual functional capacity than if he were restricted to the full range of sedentary work.[4] (R. at 531-32.) Bardsley stated that, with those limitations, light work would allow the claimant a far greater number of employment prospects. (R. at 532.) Bardsley also was asked by Hill's attorney whether a moderate mental limitation, placed in addition to the limited range of light work previously outlined, would result in a smaller number of employment prospects than the full range of sedentary work would provide. (R. at 533.) She stated that a single added moderate mental limitation would not likely impact the number of jobs available, however, depending on the number and type of moderate limitations placed on Hill, the results would vary. (R. at 533.) In response, Hill's attorney asked Bardsley to assume moderate limitations in the claimant's ability to complete a normal workday, to concentrate at work, to deal with the public, to deal with co-workers, to deal with supervisors and to maintain schedules and attendance. (R. at 533.) Based on all of these moderate limitations, and assuming the limited range of light work previously outlined by the ALJ, Bardsley stated that there would not be any jobs available for the claimant. (R. at 533.)

---

[4] Sedentary work involves lifting items weighing no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. *See* 20 C.F.R. § 404.1567(a) (2006).

A supplemental hearing was held before the ALJ on September 8, 2004. (R. at 542-48.) At this hearing, Donna Bardsley again testified in her capacity as a vocational expert. (R. at 542, 544-47.) Bardsley again was asked hypothetical questions about the claimant based on the claimant's age, educational background and a residual functional capacity to perform light work that did not involve excessive bending, stooping, crawling and repetitive lifting with his left arm and shoulder above the head. (R. at 544-45.) Based on this description, Bardsley found that there were jobs available for the claimant that existed in reasonable numbers in the regional and national economies. (R. at 545.) She stated that the claimant could perform work as a cashier, a sales clerk, an information clerk, an order clerk, a hand packager, a sorter, an assembler, an inspector, a ticket seller and a greeter. (R. at 545.) Next, Bardsley was questioned by Hill's counsel and was asked to assume that the claimant was restricted to lifting a maximum of 10 pounds occasionally. (R. at 546.) Bardsley stated that this restriction would limit the claimant to sedentary work. (R. at 546.) Bardsley then was asked to assume, once again, that the claimant was restricted to light work which did not involve excessive bending, stooping, crawling and repetitive lifting with his left arm and shoulder above the head, along with limitations consistent with the mental health assessment of Hill's ability to do work-related activities prepared by Dr. Arthur Amador, M.D., the plaintiff's treating psychiatrist, on May 13, 2002.[5] (R. at 546.) Bardsley found that, with these additional restrictions, there

---

[5] In this document, Dr. Amador opined that Hill had poor to no ability to deal with public, deal with work stresses or to maintain attention and concentration. (R. at 501.) Dr. Amador also opined that Hill had a fair ability to follow work rules, to relate to co-workers, to use judgment with public, to interact with supervisors, to function independently. (R. at 501.) The bases provided by Dr. Amador for these findings were "poor concentration, easily aggravated, irritable, erratic appetite, weakness, muscle pain (diagnosed with fibromyalgia)." (R. at 501.)

would be no jobs available for the claimant. (R. at 546.) She also found there were no jobs available for a person restricted to the aforementioned set of light work limitations, who also had a severe impairment in the ability to persist during an eight-hour day and would require an excessive number of breaks during the day due to pain. (R. at 547.) Finally, Bardsley stated that there would not be any jobs available to the claimant based on the limitations set forth in Exhibit B-26F.[6] (R. at 547.)

In rendering his decision, the ALJ reviewed records from Dr. Norman C. Ratliff, M.D.; Dr. S.C. Kotay, M.D.; Arthritis Associates; Dickenson County Medical Center, ("DCMC"); Lambert Coal Company; Norton Orthopaedics & Spine Surgery; Dr. Richard A. Feit, M.D.; University Physician's Practice Group; Sullivan Rehab Center; Cascade Disability Management; Dr. John M. Marshall, M.D.; Dr. Matthew W. Wood Jr., M.D.; Dr. Arthur Amador, M.D.; Dr. Frank M. Johnson, M.D., a state agency physician; Julie Jennings, Ph.D., a state agency psychiatrist; Ronald Brill,

---

Hill also was found to have a fair ability to understand, remember and carry out simple, detailed or complex job instructions, as well as to maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations and to demonstrate reliability. (R. at 502.) No information or medical findings were provided by Dr. Amador to support these assessments. (R. at 502-03.) Finally, Dr. Amador found Hill able to manage benefits in his own best interest. (R. at 503.)

[6] Exhibit B-26F was a series of medical records prepared by Dr. Russell D. McKnight, M.D., on January 17, 2000, April 24, 2000, May 1, 2000, and June 20, 2000. (R. at 494-500.) The first three of these reports, including Dr. McKnight's psychological report of January 17, 2000, and Dr. McKnight's medical assessment of Hill's mental ability to do work related activities of May 1, 2000, were all prepared prior to the June 15, 2000, start of the time period at issue in this case. Thus, these records were already considered and upheld by this court in affirming the ALJ's June 14, 2000, determination that Hill was not eligible for DIB. (R. at 66-82). The ALJ, in the current action, properly invoked *res judicata* to preclude any further consideration of an identical claim based on these previously considered records. *See McGowan v. Harris*, 666 F.2d 60, 65 (4th Cir. 1981) (citing *Shrader v. Harris*, 631 F.2d 297, 300-01 (4th Cir. 1980)). Therefore, any of these records dating prior to June 15, 2000, will not be reconsidered by this court except to the extent they reflect information relevant to Hill's condition from June 15, 2000, to December 31, 2002.

-9-

Ph.D.; Barry Friedman, Ph.D.; Dr. Russell D. McKnight, M.D.;. and Dr. Christopher Morris, M.D.

The majority of the medical evidence submitted in connection with Hill's current application for benefits deals with the time period after Hill's last date insured and, after reviewing this material, the ALJ properly considered only the evidence relevant to the applicable time period. (R. at 47-53.) In addition, Hill's attorney submitted additional documents to the Appeals Council but these records also were outside of the applicable time period and, thus, were deemed to be not relevant by the Appeals Council. (R. at 8-11.) All of the errors Hill asserted with respect to the ALJ's decision revolve around the ALJ's determination of Hill's alleged mental impairment. (Brief In Support Of Plaintiff's Motion for Summary Judgment, ("Plaintiff's Brief") at 12, 25, 28.) As a result, the facts below will focus solely on the documented evidence of Hill's alleged mental impairment relevant to the time period at issue in this case, June 15, 2000, to December 31, 2002.

As previously noted, prior to the relevant time period in this case, Hill filed for, and was denied, DIB benefits on two occasions. The most recent denial occurred by ALJ decision dated June 14, 2000. (R. at 86-95.) The ALJ's denial of benefits was upheld by both the Appeals Council and by the United States District Court for the Western District of Virginia. (R. at 66-82.) Included in the ALJ's findings in this prior denial of benefits was a determination that Hill did not suffer from a severe mental impairment. (R. at 79, 91.)

The June 14, 2000, ALJ's decision regarding Hill's alleged mental impairment was supported by the following evidence. The ALJ noted that Hill's only treatment

-10-

for a mental impairment had been related to his pain symptoms. (R. at 91.) The ALJ also noted that Dr. Christopher R. Morris, M.D., of Arthritis Associates, who had treated Hill since 1998 had not diagnosed Hill with a mental problem. (R. at 91.) Additionally, the ALJ specifically rejected the report of Dr. McKnight because it was prepared after only one examination of Hill and based solely on Hill's subjective complaints, not on objective clinical evidence. (R. at 90-91.) The ALJ also noted that psychological evaluations and opinions of Dr. Barry Friedman, M.D., a licensed clinical psychologist, and Dr. Sharon Hughson, M.D., were of no probative value due to the fact that they documented that Hill was exaggerating his responses and malingering. (R. at 91.) In further support of the ALJ's determination, that Hill was malingering, the ALJ noted that, when Hill's IQ was tested by Dr. Friedman, his score was much lower than his previous IQ scores documented in his school records. (R. at 91.)

The record pertaining to Hill's current complaint of a disabling mental impairment contains medical records from several sources during the relevant time period. Chronologically, the first piece of medical evidence was prepared by Dr. McKnight on June 20, 2000. (R. at 494.) This appointment was merely a follow-up check of the medication prescribed to Hill and was Hill's final documented visit with Dr. McKnight. (R. at 494.) Hill indicated that the Neurontin he was prescribed was helpful, but he still complained of being easily agitated and having poor concentration. (R. at 494.) Dr. McKnight observed Hill as having an appropriate appearance and behavior. (R. at 494.) Hill was alert, speaking clearly and had a stable but flat mood. (R. at 494.) Dr. McKnight noted that, while Hill had some delusional thoughts and forgetfulness, he was properly oriented. (R. at 494.) Dr. McKnight did not provide any diagnosis in this record and did not indicate that Hill

was suffering from a severe mental impairment. (R. at 494.)

Hill also was under the care of Dr. Morris, a rheumatologist with the Arthritis Associates, from April 13, 1998, to September 23, 2003. (R. at 302-25.) Hill saw Dr. Morris several times during the relevant time period of June 15, 2000, to December 31, 2002. (R. at 305-13.)[7] The first of these visits occurred on August 9, 2000, at which time a notation was placed in Hill's records that he had stopped seeing a psychiatrist, but Dr. Morris indicated that he would attempt to find another psychiatrist for Hill to visit for the purpose of pain control and to review Hill's medication. (R. at 312-13.) Dr. Morris also indicated that Hill was experiencing bouts of insomnia. (R. at 313.) On November 13, 2000, Dr. Morris's notes indicate that Hill had informed him that he had resumed seeing Dr. McKnight.[8] (R. at 312.)

At his visits to Dr. Morris in August 2000, November 2000 and February 2001, the record indicates that Hill claimed that his workers compensation benefits and/or his medical coverage would not pay for mental health medications such as Zoloft and Xanax, which were allegedly prescribed to him by Dr. McKnight. (R. at 311-13.) As a result, Hill asked Dr. Morris to prescribe him these medications. (R. at 311-13.) No record from Dr. McKnight exists to substantiate that he ever prescribed Zoloft or Xanax to Hill. Dr. Morris did prescribe Hill both Zoloft and Xanax, but also noted that Hill should not be given any narcotics. (R. at 312.)

---

[7] The medical records of Hill's treatment by Dr. Morris are largely illegible.

[8] While Hill may have stated to Dr. Morris that he had resumed seeing Dr. McKnight, there are no medical records to substantiate this claim. The last documented visit by Hill to see Dr. McKnight occurred on June 20, 2000. (R. at 494.)

-12-

At Hill's February 5, 2001, appointment with Dr. Morris, he stated that Zoloft had helped him. (R. at 311.) Once again on June 11, 2001, Hill stated that he was sleeping better and that Zoloft had helped. (R. at 311.) However, at this time, Hill's Zoloft was decreased due to sexual side effects, and Hill was prescribed Welbutrin. (R. at 311.) Hill also was given Ambien as a sleep aid. (R. at 311.) On September 4, 2001, Dr. Morris found Hill continuing to do well, noting improved sleep due to Ambien and improvement in his sexual function. (R. at 309.)

On December 4, 2001, Hill reported to Dr. Morris that he had stopped taking Zoloft because of bad dreams. (R. at 308.) The remainder of the records from this visit are illegible. Hill's next visit to Dr. Morris was on February 19, 2002. (R. at 308-09.) Hill indicated that he was going to see a new psychiatrist, and Dr. Morris stated that the psychiatrist should review all of Hill's medications. (R. at 308.) Hill also saw Dr. Morris on July 3, 2001, May 23, 2002, August 13, 2002, December 17, 2002; however, these records, to the extent they are legible, do not discuss Hill's psychological treatment. (R. at 305-07, 310.) However, there were notations at the August and December visits that appeared to indicate that Hill was again prescribed Xanax. (R. at 305-06.) To the extent that Dr. Morris's records are decipherable, at no time during the relevant time period did Dr. Morris document any symptoms of a severe mental impairment, diagnose any mental impairment or impose any work-related limitations on Hill due to any mental impairment. (R. at 305-13.)

Hill was treated by Dr. Norman C. Ratliff, M.D., from March 24, 1994, until May 10, 2002. (R. at 165-68.) These records deal exclusively with Hill's physical condition and at no point during the relevant time period was Hill ever diagnosed with a mental impairment of any sort. (R. at 165-68.) There is no record of any sort

of disabling mental condition or symptoms of a mental impairment reported by Dr. Ratliff. (R. at 165-68.) In fact, Dr. Ratliff noted that Hill was working during the period in which he claimed to be disabled. (R. at 166.) There are notations in Hill's records indicated that he was working on January 22, 2001, February 12, 2001, and on May 30, 2001. (R. at 166.) Likewise, on May 30, 2001, there is a notation that Hill was "working long hours."[9] (R. at 166.)

Dr. Arthur Amador, M.D., first saw Hill on February 25, 2002, upon referral from Dr. McKnight. (R. at 361-69.) In this first visit with Hill, Dr. Amador performed a psychiatric examination on Hill.[10] (R. at 361-69.) At this appointment, Hill's primary complaints were that he could not stay focused and he could not keep his "head straight." (R. at 361.) Dr. Amador also noted that Hill had a history of depression and that he continued to complain that he was easily aggravated, he was irritable, he had an erratic appetite and he had sleep problems. (R. at 361-62.) Dr. Amador opined that Hill had fair attention, concentration, impulse control, judgment and insight. (R. at 364, 367.) Hill's thought process was found to be relevant and coherent. (R. at 365.) Dr. Amador found that Hill's memory was intact, that he was of average intelligence and that he was articulate. (R. at 364, 367.) However, Dr. Amador also noted that Hill's affect was constricted and his mood was depressed. (R.

---

[9] Hill specifically stated in his disability report, which was prepared as part of his DIB application and signed on September 9, 2002, that he had not worked since September 12, 1997. (R. at 127, 135.) However, it should be noted that Hill's disability report contained some inconsistency regarding work performed since the alleged onset date of his disability, September 12, 1997. The report clearly stated that Hill had not worked since September 12, 1997; however, Hill indicated on the same form that he had attempted to work "a couple of hours" after his injury on September 12, 1997, but that he could not stand the pain. (R. at 127.) Regardless of this inconsistency, it is clear that Hill has never informed the Social Security Administration that he was working "long hours" during his alleged period of disability.

[10] Dr. Amador's psychiatric examination and mental status report is not entirely legible.

-14-

at 365.) Hill was not delusional, suicidal, homicidal and not experiencing hallucinations. (R. at 366.) Hill was alert, stable, and oriented. (R. at 366.) Dr. Amador provided a diagnostic impression that Hill experienced pain disorder due to fibromyalgia and was given a Global Assessment of Functioning, ("GAF"), score of 50-55.[11] (R. at 368.) Hill was diagnosed with pain disorder associated with psychological factors and multiple medical conditions. (R. at 368.) Additionally, he was diagnosed with depression not otherwise specified. (R. at 368.) In addition, to continuing his other medications, such as Xanax, Hill was prescribed Remeron. (R. at 369.)

Dr. Amador completed an assessment of Hill's ability to do mental work-related activities on May 13, 2002. (R. at 501-03.) Dr. Amador reported that Hill had poor to no ability to deal with the public, deal with work stresses and to maintain attention and concentration. (R. at 501.) However, Dr. Amador noted that Hill had a fair ability to follow work rules, relate to co-workers, use judgment with the public, interact with supervisors and to function independently. (R. at 501.) Hill was documented as having a fair ability to understand and carry out complex, detailed and simple job instructions. (R. at 502.) Hill also was found to have a fair ability to maintain his personal appearance, behave in an emotionally stable manner, relate predictably in social situations and demonstrate reliability. (R. at 502.) Dr. Amador opined that Hill was capable to manage benefits in his own interest. (R. at 503.)

---

[11]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994.) A GAF of 51-60 indicates that an individual has "[m]oderate symptoms . . . OR moderate difficultly in social, occupational or school functioning . . . ." DSM-IV at 32.

Hill next returned to Dr. Amador on May 21, 2002, for a 15-minute, follow-up visit. (R. at 360.) At this visit, Hill reported that he was irritable and had experienced anger spells. (R. at 360.) While Dr. Amador described Hill as dysphoric with a constricted affect, Hill was not experiencing any homicidal/suicidal ideation or auditorial/visual hallucinations. (R. at 360.) Hill was documented as possessing fair impulse control, limited insight and fair judgment; additionally, Hill's speech was coherent and relevant. (R. at 360.) Hill was prescribed Celexa because the Remeron previously prescribed had produced no benefit. (R. at 360.)

Hill's next follow-up appointment with Dr. Amador occurred on August 22, 2002. (R. at 359.) At this time, Hill stated that he was not as irritable and that Celexa had helped him to calm down but caused nightmares. (R. at 359.) Dr. Amador described Hill's mood as mildly depressed with blunted affect with fair impulse control, fair insight and judgment. (R. at 359.) Hill's dose of Celexa was increased and moved to the morning. (R. at 359.)

Hill's improvement continued on November 22, 2002. (R. at 358.) At this appointment Hill stated that Celexa was continuing to help him calm down "much better in the morning," but that he became aggravated in the early evening. (R. at 358.) Dr. Amador reported no side effects from Hill's medications and that his sleep was better. (R. at 358.) Dr. Amador also reported that Hill's mood was no longer depressed, but neutral with a blunted affect. (R. at 358.) Furthermore, Hill's impulse control was now adequate and his judgment and insight were both fair. (R. at 358.) As a result, Hill's Celexa dosage was increased and his Xanax decreased. (R. at 358.)

On September 13, 2002, Hill reported to emergency room at DCMC with a

-16-

chief complaint of pain in his elbow and forearm. (R. at 406-09.) He was diagnosed with acute exacerbation of fibromyalgia and told to follow up with his physician. (R. at 408.) During this emergency room visit the doctors noted that Hill was awake, alert, oriented with no motor or sensory deficit. (R. at 408.) The physician also noted that Hill had a normal mood and affect. (R. at 408.) The doctors did not document or observe any depression and no other mental problems. (R. at 408.)

A residual physical functional assessment was completed on March 14, 2003, by Dr. Frank M. Johnson, M.D., a nonexamining state agency physician, who examined Hill's records through his date last insured. (R. at 371-79.) He found that Hill could perform activities consistent with the ability to perform light work. (R. at 372-77.) Dr. Johnson did not make any determinations with regard to Hill's mental state, however, he did state that, in general, Hill's allegations were not fully credible. (R. at 378.) This assessment was made in part because of the fact that Hill could perform numerous activities of daily living including preparing meals, cleaning tables, doing laundry, mowing his lawn with a riding lawnmower, shopping at Wal-Mart, performing lawn work, gardening, watching television, visiting his children and grandchildren, driving, going for walks and sitting on his porch. (R. at 378.)

State agency psychologist, Julie Jennings, Ph.D., completed a Psychiatric Review Technique Form, ("PRTF"), regarding Hill on March 17, 2003. (R. at 380-95.) From her review of Hill's mental health treatment records during the relevant time period, Jennings found that Hill's mental impairment or impairments were not severe. (R. at 380.) She indicated that Hill suffered from depression characterized by psychomotor agitation or retardation and decreased energy. (R. at 383.) In her assessment, Jenkins found that Hill's condition resulted in mild restrictions in

-17-

activities of daily living, in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 390.) She found no episodes of decompensation. (R. at 390.) She also opined that Hill's symptoms were considered nonsevere and were partially credible. (R. at 392.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. § 404.1520 (2006), *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520 (2006). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2006).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant maintains the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2) (West 2003 & Supp. 2006); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65;

Case 2:06-cv-00032-GMW-PMS   Document 13   Filed 03/15/07   Page 18 of 29   Pageid#: 83

*Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated September 20, 2004, the ALJ denied Hill's claim. (R. at 46-57.) The ALJ found that Hill met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2002, but not thereafter. (R. at 55.) Pursuant to 20 C.F.R. § 404.957(c), the ALJ noted that *res judicata* applied due to the Commissioner's prior final decisions regarding Hill's claims arising from the same facts. (R. at 47.) As a result, the ALJ stated that Hill's prior applications would not be reopened, and all parts of Hill's current claim relating to the time period prior to the final determination made on June 14, 2000, were dismissed pursuant to the doctrine of *res judicata*. (R. at 47.) Thus, the ALJ found the time period at issue in this case to be June 15, 2000, through December 31, 2002. (R. at 47, 49, 55-56.) Upon consideration of the evidence regarding this time period, the ALJ found that Hill was not under either a physical or mental disability. (R. at 48, 56.) The ALJ made a finding that Hill's fibromyalgia and chronic pain syndrome were "severe" impairments based on the requirements of 20 C.F.R. § 404.1520(c). (R. at 55.) However, the ALJ determined that these severe impairments did not meet or medically equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 55.) Furthermore, the ALJ found that Hill's allegations regarding his limitations were not totally credible. (R. at 56.) The ALJ concluded that during the period from June 15, 2000, through December 31, 2002, Hill retained the residual functional capacity to perform light work that did not involve excessive bending, stooping, crawling or repetitive overhead lifting with his left arm and shoulder. (R. at 52, 56.) Thus, the ALJ determined that Hill was unable to perform any of his past relevant work as a mechanic, electrician or coal mine shuttle car operator. (R. at 48, 56.) Despite this finding, the ALJ concluded that, based on Hill's age, education and

-19-

the testimony of a vocational expert, Hill could perform jobs existing in significant numbers in the national economy, including those of a cashier, a sales clerk, an information clerk, an order clerk, a hand packer, a sorter, an assembler, an inspector, a ticket seller and a greeter. (R. at 56.) Therefore, the ALJ found that Hill was not under a "disability," as defined in the Act, at any time prior to December 31, 2002, and that he was not eligible for benefits. (R. at 56.) *See* 20 C.F.R. § 404.1520(g) (2006).

The plaintiff argues that the ALJ's decision with respect to his alleged mental impairment is not supported by substantial evidence. Specifically, Hill argues that the ALJ erred by failing to find that he suffered from a severe mental impairment and by failing to consider the impact of his mental impairments on his ability to work. (Plaintiff's Brief at 12.) Hill has not contested the ALJ's finding as to his physical residual functional capacity. To the extent Hill is challenging the ALJ's determination of his residual functional capacity, he simply alleges that the ALJ did not consider the combined effects of all of his impairments. (Plaintiff's Brief at 25.) All of Hill's remaining arguments are derivative of his claim that the ALJ improperly determined that his mental impairment was not severe. (Plaintiff's Brief at 25, 28.) Therefore, if the ALJ's decision with respect to the severity of Hill's mental impairment is supported by substantial evidence, Hill's remaining arguments will fail.

Hill's first argument is that the ALJ's decision is not supported by substantial evidence because the ALJ erred by both failing to find that Hill suffered from a severe mental impairment and failing to consider the impact of Hill's mental impairments on his ability to work. (Plaintiff's Brief at 12.) This argument is without merit.

In his opinion, the ALJ stated that the evidence in the record during the relevant time period pertaining to Hill's mental impairments indicated that he was not suffering from a severe impairment. (R. at 53.) In support of this conclusion, the ALJ noted that Dr. Amador's records documented an improvement in Hill's condition with treatment. (R. at 53.) Dr. Amador's mental medical assessment, completed on May 13, 2002, was rejected by the ALJ based on the fact that this assessment was prepared after only one visit with Hill, and because it did not reflect the improvement in Hill's mental state documented as a result of Dr. Amador's treatment. (R. at 53.) The ALJ stated that Dr. Amador's report was based primarily on Hill's presentation, not on objective medical findings. (R. at 53.) Moreover, the ALJ found that the record as a whole did not support Dr. Amador's conclusions. (R. at 53.) Based on these conclusions, and the fact that Hill's mental health symptoms were treatable with medication, the ALJ determined that Hill did not suffer from a severe mental impairment. (R. at 53.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided that his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

In this case, the ALJ's finding of no severe mental impairment is supported by

-21-

substantial evidence and, thus, will be upheld. *See Sterling Smokeless Coal Co.*, 131 F.3d at 439-40; *Hays*, 907 F.2d at 1456. The Social Security Regulations define a "nonsevere" impairment as an impairment or combination of impairments that do not significantly limit a claimant's ability to do basic work activities. *See* 20 C.F.R. § 404.1521(a) (2006). Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering simple job instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in routine work setting. *See* 20 C.F.R. § 404.1521(b) (2006). The Fourth Circuit has held that an impairment is not severe if it can be considered a slight abnormality that has a minimal impact on a person and would not be expected to interfere with an individual's ability to work. *See Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984) (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984) (citations omitted)).

Although Hill complained of being easily aggravated, having poor concentration, being irritable, having an erratic appetite and having sleep problems, he has never been unable to work because of mental problems. Despite the work-related limitations Dr. Amador asserted in Hill's assessment on May 13, 2002, which were based largely on Hill's subjective complaints, Dr. Amador still noted that Hill had a fair ability to follow work rules, relate to co-workers, use judgment with the public, interact with supervisors and to function independently. (R. at 501.) Dr. Amador also noted that Hill had a fair ability to understand and carry out complex, detailed and simple job instructions and a fair ability to maintain his personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. (R. at 502.) Hill also was found able to

Case 2:06-cv-00032-GMW-PMS   Document 13   Filed 03/15/07   Page 22 of 29   Pageid#: 87

manage benefits in his own interest. (R. at 503.)

Furthermore, no other source or treating source during the applicable time period documented any severe mental impairment that would limit Hill's ability to work. (R. at 165-68, 302-13, 371-79, 380-95, 406-09, 494.) Neither Dr. Morris or Dr. Ratliff, who treated Hill for approximately eight and five years respectively, ever diagnosed a severe mental impairment or placed limitations on Hill's ability to work due to mental problems during the relevant time period. (R. at 302-13, 165-66.) Moreover, when Hill visited the DCMC emergency room on September 13, 2002, his doctors specifically noted that Hill's mood and affect were normal and they did not document any depression or other mental disorders. (R. at 408.)

Finally, Dr. Amador's own records indicate a dramatic improvement in Hill's mental condition after he was treated with medication. Hill began to see Dr. Amador in February of 2002 for his first documented visit to a psychiatrist since August of 2000. (R. at 313, 361-69.) At this time, Dr. Amador described Hill's mood as depressed. (R. at 365.) However, with the addition of the medication Celexa, and through adjustment of the dosage, Dr. Amador documented a steady improvement in Hill's mood. (R. at 358-60.) After starting on Celexa, Hill's mood improved from depressed with a constricted affect to mildly depressed with a blunted affect. (R. at 359-60, 365.) By his final visit to Dr. Amador during the relevant time period, Hill's mood was no longer depressed; it was neutral. (R. at 358.) Dr. Amador also noted that Hill continued to display fair judgment and insight; moreover, his impulse control had improved and was now adequate. (R. at 358.) Furthermore, at this final appointment, Hill noted that the Celexa prescribed by Dr. Amador was continuing to help him clam down and his sleep was much better. (R. at 358.)

-23-

It is well established that "[i]f a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (citing *Purdham v. Celebrezze*, 349 F.2d 828, 830 (4th Cir. 1965)). In this case, there is substantial evidence supporting the ALJ's determination that medication or treatment could control Hill's symptoms. In addition to the control over Hill's symptoms resulting from his treatment with Celexa, Hill stated on June 20, 2000, that Neurontin was somewhat helpful in controlling his symptoms. (R. at 494.) From February 5, 2001, until December 4, 2001, Hill reported to Dr. Morris that Zoloft had helped him control his mental symptoms until he stopped taking it reportedly because it was causing him bad dreams and sexual dysfunction. (R. at 308-11.) Additionally, Hill reported improvements in his sleep patterns when taking Ambien. (R. at 309.) Therefore, substantial evidence in the record indicates that when the claimant is seeing a psychiatrist, his mental health symptoms can be controlled by medication.

Aside from the fact that Hill's mental impairment could be treated with medication, perhaps the strongest evidence in support of the ALJ's determination that no severe mental impairment existed was that during the relevant time period Hill appears to have resumed work. (R. at 166.) Dr. Ratliff's notes indicate that on January 1, 2001, Hill was working in an environment with smoke and grease. (R. at 166.) This same notation was made on February 12, 2001. (R. at 166.) Likewise, on May 30, 2001, Dr. Ratliff's notes indicate that Hill was continuing to work and that Hill had been "working long hours." (R. at 166.) Therefore, Dr. Ratliff's records document that Hill was working during a period lasting at least five months, including a stretch where he worked "long hours." (R. at 166.) This period where Hill was working and "working long hours" was during the time period in which he

-24-

now claims to have been suffering from a severe, disabling mental condition. (R. at 127, 166.)

This revelation proves that Hill's impairment was not severe based on the Fourth Circuit's interpretation of a severe impairment. *See Evans v. Heckler*, 734 F.2d at 1014. Based on Dr. Ratliff's records, Hill's alleged mental impairment had only a minimal impact, if any, on Hill and did not interfere with his ability to work. Indeed, Dr. Ratliff's records indicate that Hill did not report any difficulty with working "long hours" because of mental problems; instead, Hill's only asserted difficulties resulted from physical injuries and pain. (R. at 166.) Furthermore, this time period where Hill was apparently employed and working "long hours" coincided with the time period where Hill also was not seeking out any mental health treatment and simply continuing to receive medication through Dr. Morris. Therefore, it is reasonable to conclude that Hill's mental impairment was not severe either because it did not interfere with his ability to work, or because it was controlled by medication.

Additionally, the fact that Hill did not disclose that he had been working "long hours" for several months during his period of alleged disability provides substantial evidence to support to the ALJ's finding that Hill's subjective claims were not totally credible. (R. at 56.) Moreover, Dr. Johnson, a state agency physician, and Jennings, a state agency psychologist, both concluded that Hill's allegations were only partially credible based largely on the activities of daily living Hill admitted undertaking. (R. at 378, 392.) Likewise, the prior ALJ's decision issued on July 14, 2000, noted that Hill's allegations were not totally credible citing Hill's lack of effort during mental examinations which yielded IQ test results far below the IQ test score Hill received

-25-

while in school.  (R. at 91.)

Hill also argues that the ALJ improperly rejected Dr. Amador's May 13, 2002, report because it came from a treating source.  However, it is well-settled that while an ALJ may not reject medical evidence for no reason or for the wrong reason, see *King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently explains his rationale and if the record support his findings.  If a treating source's opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and it is not inconsistent with other substantial evidence, it is given controlling weight.  *See* 20 C.F.R. § 404.1527(d)(2) (2006).  However, the Fourth Circuit has noted that "circuit precedent does not require a treating physician's testimony 'be given controlling weight.'"  *Craig v. Charter*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)).  If the opinion "is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight."  *Craig*, 76 F.3d at 590.  "[T]he testimony of a non-examining physician can be relied upon when it is consistent with the record."  *Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir. 1986) (citing *Kyle v. Cohen*, 449 F.2d 489, 492 (4th Cir. 1971)) .

In this case, the report of Dr. Amador is not consistent with other substantial evidence in the record and it is not supported by clinical evidence.  Thus, the ALJ was justified in rejecting this report.  *See Craig*, 76 F.3d at 590.  The following is some of the evidence in the record that was inconsistent with this report.  First, none of other physicians treating Hill during the relevant time period made any notations

-26-

about Hill suffering from a severe mental impairment that would limit his ability to work. (R. at 165-68, 302-13, 371-79, 380-95, 406-09, 494.) Furthermore, no limitations consistent with Dr. Amador's report were ever placed on Hill's ability to work by any other treating source during the relevant time period. In fact, Dr. Morris, who treated Hill throughout the entire relevant time period and wrote the majority of the prescriptions for Hill's mental health medications, never documented a severe mental impairment and never imposed any work related mental limitations on Hill. (R. at 305-13.) In fact, it appears from the record that Dr. Morris only referred Hill to psychiatrists to have Hill's prescriptions reviewed. (R. at 308, 312-13.)

The mental problems listed by Dr. Amador on his report in support of the limitations he described on Hill's ability to perform work-related functions were simply that Hill had poor concentration, he was easily aggravated and that he was irritable. (R. at 501.) All of these symptoms appear to be based solely on Hill's subjective complaints documented at Dr. Amador's one prior visit with Hill before the report was prepared, (R. at 361-69), not on objective medical evidence. As discussed above, substantial evidence exists in the record to support the ALJ's conclusion that Hill's subjective complaints were not totally credible. Additionally, at the time it was prepared, Dr. Amador's report did not reflect the steady, dramatic improvement that he personally documented through Hill's treatment until the end of the relevant time period discussed above. (R. at 358-60.)

Consequently, Dr. Amador's report was not consistent with the dramatic improvement that he documented through Hill's treatment, and the report was largely based on Hill's claims which were not totally credible. (R. at 358-60.) Thus, substantial evidence supports the ALJ's finding that the record, as a whole, does not

-27-

indicate a high degree of mental distress, and substantial evidence supports the ALJ's finding that the record does not support the assertions in Dr. Amador's report which indicate a high degree of mental distress. Therefore, the ALJ was justified in the weight given to Dr. Amador's report.

Hill also asserts that the ALJ did not properly consider the combined impact of all of his impairments in the ALJ's assessment of his residual functional capacity. (Plaintiff's Brief at 25.) This argument is without merit. In making his determination of a claimant's residual functional capacity, the ALJ "must consider the combined effect of a claimant's impairments and not fragmentize them" regardless of whether these impairments, if taken individually, would cause disability. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). In this case, the ALJ reviewed the relevant evidence and stated "following a thorough review of the *entire* record, the Administrative Law Judge concludes that the claimant retains the residual functional capacity to perform light work . . . ." (R. at 52) (emphasis added). The ALJ continued by stating that no physician documented significant problems with memory or concentration and stated that he "considered the evidence pertaining to a mental impairment for the period under consideration." (R. at 53.) Therefore, it is the court's opinion that the ALJ properly considered the combined effects of the claimant's impairments on his ability to work.

All of Hill's remaining arguments are predicated on, and derivative of, the assertion that the ALJ erred in finding Hill's mental impairment was not severe. As a result, all of Hill's remaining arguments are without merit. It is this court's belief that the ALJ's opinion is supported by substantial evidence; thus, the ALJ's decision will be upheld.

*IV. Conclusion*

For the foregoing reasons, Hill's motion for summary judgment will be overruled, the Commissioner's motion for summary judgment will be sustained and the Commissioner's decision denying benefits will be affirmed.

An appropriate Order will be entered.

**DATED:**     This **15** day of March, 2007.

THE HONORABLE GLEN M. WILLIAMS
SENIOR UNITED STATES DISTRICT JUDGE